# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SHEILA WALKER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:16-CV-3003-BH |
| | § | |
| NANCY A. BERRYHILL ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Consent |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated February 21, 2017 (doc. 20), this case has been transferred for the conduct of all further proceedings and the entry of judgment. Before the Court are the plaintiff's *Motion for Summary Judgment*, filed February 21, 2017 (doc. 18), and *Defendant's Cross-Motion for Summary Judgment*, filed March, 13, 2017 (doc. 21). Based on the relevant fillings, evidence, and applicable law, the plaintiff's motion is **DENIED**, the defendant's cross-motion is **GRANTED**, and the Commissioner's decision is **AFFIRMED**.

## I.   BACKGROUND[1]

### A.   Procedural History

Sheila Joyce Walker (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying her claims for disability insurance benefits (DIB) under Title II of the Social Security Act (Act) and for supplemental security income (SSI) under Title XVI

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

[2] At the time of filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

of the Act. (R. at 13.) On February 1, 2013, Plaintiff filed her applications alleging disability

beginning on October 15, 2012.[3] (*Id.*) Her applications were initially denied on June 7, 2013, and

upon reconsideration on August 26, 2013. (*Id.*) She requested a hearing before an Administrative

Law Judge (ALJ), and personally appeared and testified at a hearing on November 3, 2014. (*Id.*) On

February 12, 2015, the ALJ issued his decision finding that Plaintiff was not disabled and denying

her claims for benefits. (R. at 25.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council. (R. at 1.) The Appeals

Council denied her request for review on September 4, 2016, making the ALJ's decision the final

decision of the Commissioner. (R. at 1-7.) Plaintiff timely appealed the Commissioner's decision

under 42 U.S.C. § 405(g). (*See* doc. 1.)

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born on September 3, 1959, and was fifty-five years old at the time of the

hearing. (R. at 36.) She received a high school education and attended vocational school, where she

received a Certificate in Medical Administration. (R. at 34, 36.) Her prior work experience included

mortgage processor, mortgage clerk, claims clerk, receptionist, and secretary. (R. at 34.)

### 2.    Medical Evidence

On September 21, 2009, Plaintiff met with Dr. Hamed Pashaie, M.D., at the Baylor

University Medical Center (Baylor) for a physical examination and check-up for her previously

diagnosed diabetes mellitus. (R. at 376.) He noted that her blood sugar and blood pressure were not

under control and requested blood work. (R. at 377.) He also reported that Plaintiff complained

---

[3] Plaintiff initially alleged September 15, 2012, as her date of disability, but she subsequently amended it to October 15, 2012. (R. at 13.)

about a "slight tenderness on the right side of her neck," but noted that she had a normal range of motion, except for a decreased range of motion in her right elbow. (*Id.*)

On October 19, 2009, Plaintiff returned to Dr. Pashaie for a physical examination and review of her blood tests. (R. at 373.) Because her blood work showed "high hemoglobin A1c," he increased the dosage of her diabetic medications. (R. at 374.) Plaintiff's blood pressure was high during the check-up, but Dr. Pashaie noted that she said it was "only high when she went to the doctor", and that her blood pressure readings at home were within the "normal" range. (*Id.*)

On October 6, 2010, Plaintiff presented to the Baylor emergency room with complaints of high blood sugar. (R. at 332.) She reported pain in the "left occipital area and left base of the skull," which she attributed to recent blood sugar episodes. (*Id.*) She was prescribed pain medication and instructed to return to Dr. Pashaie for re-evaluation. (R. at 333.)

On October 11, 2010, Plaintiff met with Dr. Pashaie for an evaluation of her blood sugar. (R. at 326.) She reported that her blood sugar had fallen to 45 in the past week and caused her to feel "shaky and cold." (*Id.*) Dr. Pashaie reduced her prescription medication dosage and recommended that she stop drinking Sprite and other soft drinks to help control her blood sugar levels. (R. at 327.)

On April 18, 2011, Plaintiff returned to Dr. Pashaie with complaints of pain in her right wrist, which she rated in intensity as a nine out of ten. (R. at 294, 303.) She claimed that she had a history of carpal tunnel syndrome, and that the pain in her wrist was likely induced from typing at her new job. (R. at 293.) Dr. Pashaie recommended that she buy a brace from Wal-Mart and use over-the-counter medication for the pain. (R. at 296.) He also reported that the reduction of her blood sugar medication showed positive results, and that Plaintiff was doing well. (R. at 298.)

On August 15, 2011, November 9, 2011, and May 7, 2012, Plaintiff had follow-up

evaluations with Dr. Pashaie. (R. at 282, 286, 290.) At each session, they discussed the importance of taking her medication, exercising, and following a diabetic diet to control her blood sugar. (R. at 283, 287, 291.) He frequently noted that Plaintiff was doing well, her blood sugar was under control, and she felt "about the same" as she did during her prior appointments. (R. at 282, 288.) He evaluated her muscle strength, upper extremity reflexes, and hand grips, which he found to be normal. (R. at 292.) He also assessed her carpal tunnel syndrome and reported that "her muscle strength and upper extremity reflexes" were normal. (R. at 288.)

On February 18, 2013, Plaintiff met with Dr. Douglas Scott Eddy, M.D., at the Baylor outpatient clinic. (R. at 467.) She complained of osteoarthritis pain in her right wrist and elbow, which occurred mainly in the mornings. (R. at 471.) Plaintiff reported stiffness in her joints that worsened with movement. (R. at 466.) She also experienced pain in her right hand and had difficulties flexing her thumb, which was slightly swollen at the examination. (R. at 468.) Dr. Eddy prescribed several pain medications and ordered X-rays of her left extremities. (R. at 468.) Plaintiff returned to Baylor on February 25, 2013, for X-rays of her left shoulder, which showed acromioclavicular joint arthritis, and for X-rays of her left knee, which showed mild osteoarthritis "manifested by medial compartmental joint space narrowing." (R. at 469-74.)

On May 8, 2013, Plaintiff met with Dr. Mahmood B. Panjwani, M.D., P.A., for a consultative internal medicine examination. (R. at 438.) She reported a history of diabetes mellitus, blurry vision, numbness in her fingers and toes, and problems with gross hand activities. (R. at 438.) Plaintiff also reported joint pain in her hands, elbows, shoulder, knees, ankles, and feet. (R. at 438-39.) She had difficulties "grasping, gripping, holding, lifting, pushing, and pulling," and she could not "sit, stand [or] walk for more than 30 minutes at a time." (R. at 439.) She had crepitus in her knees, and pain

in her right hand and thumb when she made a tight fist. (R. at 440-41.) Dr. Panjwani's impressions were "diabetes mellitus with associated blurry vision and neuropathy symptoms; arthritis in her shoulders, upper back, neck, elbows, knees and hands; and DeQuervain's tendinitis." (R. at 441, 442.) He noted that Plaintiff showed some discomfort flexing her knees but did not utilize any assistive devices to get on and off the examination table. (R. at 441.) He also described her as awake, alert, and oriented. (*Id.*)

On May 22, 2013, Plaintiff met with Dr. Laura J. Cooper, Psy.D., for a consultative mental status examination to evaluate her claims of "poor memory and confusion." (R. at 445.) She claimed that she was unable to work due to her pain, her inability to control her blood sugar, and her difficulties concentrating and remembering. (R. at 446.) She had made several attempts to find a job after she was fired, but was not hired anywhere. (*Id.*) She described her typical day as "piddling around the house; doing laundry; cleaning the house; and cooking meals." (*Id.*) Plaintiff reported that she did all the shopping, paid all the bills, hired a man to care for her yard, and enjoyed socializing with her neighbor. (*Id.*) She lived at home by herself and denied having problems managing her personal hygiene. (*Id.*) Plaintiff also reported that she visited her friend every day and provided her own transportation. (R. at 447.) She did not report having problems "using the telephone and taking messages" or using a phone directory and a computer. (R. at 446.) Dr. Cooper opined that Plaintiff's concentration was not limited, and that she did not have difficulties with her short-term or long-term memory. (R. at 448.) Her diagnosis was "adjustment disorder with depressed mood-chronic," and she opined that Plaintiff "[demonstrated] adequate ability to reason and to make occupational, personal, and social adjustments." (R. at 449-50.)

On June 1, 2013, Plaintiff presented to the Baylor emergency room with complaints of hand

and neck pain that she attributed to her arthritis. (R. at 480, 482.) The pain began in her wrist, but then moved to her upper right hand, shoulder, and neck. (*Id.*) Plaintiff claimed that the pain increased with movement and "decreased her range of motion." (*Id.*) She also had tenderness and a decreased range of motion in her neck. (R. at 483.) She was diagnosed with a muscle spasm and muscle strain, and she was prescribed pain medication upon discharge. (R. at 484.)

On June 5, 2013, Dr. Yvonne Post, D.O., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) assessment based upon the medical evidence. (R. at 79-80.) Dr. Post opined that Plaintiff had the following exertional limitations: occasionally lift/carry 20 pounds; could frequently lift/carry 10 pounds; could stand/walk for a total of about 6 hours in an 8-hour workday; could sit for a total of about 6 hours in an 8-hour workday; and had an unlimited ability to push/pull. (R. at 70.) Plaintiff also had manipulative limitations that limited her to only frequent handling with her right hand and arm. (R. at 80.)

On August 26, 2013, Dr. Roberta Herman, M.D., SAMC, completed a physical RFC assessment of Plaintiff upon reconsideration. (R. at 98-99.) She agreed with Dr. Post's opinions that Plaintiff could occasionally lift/carry 20 pounds; could frequently lift/carry 10 pounds; could stand/walk for a total of about 6 hours in an 8-hour workday; could sit for a total of about 6 hours in an 8-hour workday; and had an unlimited ability to push/pull. (R. at 98.) Dr. Herman also agreed that Plaintiff was limited to frequent handling with her right upper extremity. (R. at 99.)

On July 17, 2013, Plaintiff presented to the Baylor emergency room for chest and neck pain. (R. at 486.) The attending physician ordered X-rays of her cervical spine, which showed "degenerative changes at the C4-5" vertebrae. (R. at 487.) She was diagnosed with "acute neck pain," prescribed pain medication, and instructed to follow-up with her primary care physician. (R.

at 491-92.)

On July 29, 2013, Dr. Eddy completed a RFC questionnaire on behalf of Plaintiff. (R. at 579-83.) He diagnosed her with osteoarthritis, type 2 diabetes mellitus, and cervical degenerative disease. (R. at 579.) He opined that she could work only "low stress jobs." (R. at 580.) She did not need to take walking breaks in an eight-hour work day; did not need a job that permitted her to shift positions at will from sitting, standing, and walking; was limited to walking 1 city block without pain or severe pain; and capable of sitting for more than 2-hours continuously and for about 4-hours in an 8-hour workday. (R. at 581.) Plaintiff could stand and walk for 15-minutes continuously and for less than 2-hours during an 8-hour workday; lift and carry 10 pounds occasionally and less than 10 pounds frequently; and handle with her right hand for 10% of an 8-hour workday and for 20% with her left hand. (R. at 581-82.) She was limited to fingering 0% of an 8-hour workday with her right hand and 15% with her left hand; limited to reaching 5% of an 8-hour workday with her right upper extremity and 40% with her left upper extremity; and would likely be absent from work due to her impairments or treatment more than four times a month. (R. at 582-83.) He also opined that Plaintiff would need to take unscheduled hourly breaks to rest for 15 minutes before going back to work. (R. at 581-82.)

On March 20, 2014, Plaintiff returned to Dr. Eddy for a follow-up. (R. at 499.) She reported that her arm and leg pain had improved. (*Id.*) He noted that Plaintiff had diabetes neuropathy, muscle spasms, arthritis, and mild to medium carpal tunnel on her right side. (R. at 504.) He instructed her to walk thirty minutes a day, five times a week. (R. at 504-505.)

### 3.  Hearing Testimony

On November 3, 2014, Plaintiff and a vocational expert (VE) testified at a hearing before the

ALJ. (R. at 30-71.) Plaintiff was represented by an attorney. (R. at 30.)

### a. *Plaintiff's Testimony*

Plaintiff testified that she was born on September 3, 1959, and was fifty-five years old. (R. at 36.) She graduated high school and attended vocational school, where she received a Certificate in Medical Administration in 2005. (R. at 36-37.)

Plaintiff previously worked as a mortgage processor, but she often had to take breaks during the workday when she was in pain. (R. at 56-57.) On October 15, 2012, she was fired because her company "needed someone . . . to handle the full tasks that they were looking for." (R. at 57.) Though she looked for other jobs and attended interviews, she had not worked or received an income since her onset date of disability of October 15, 2012. (R. at 37.)

Plaintiff had diabetes and was unable to control her blood sugar. (R. at 38.) She took her insulin every morning and followed a diabetic diet, but her blood sugar regularly ranged from 130 to 170 and ran up to 365. (R. at 40.)  She was incapable of working with high blood sugar because she was unable to think straight and felt fatigued. (*Id.*)

Plaintiff also had neuropathy in her legs, knees, and feet. (R. at 41.) The neuropathy affected the joints in her toes and caused her toes to go numb. (R. at 41-42.) She also reported numbness, tingling, and a shooting pain in her heel, which was alleviated by Tylenol. (R. at 42.)

Plaintiff had carpal tunnel in her right arm and hand. (R. at 43, 48.) She "[used] a heating pad every night," massaged her arm, and wore a brace to alleviate the pain. (R. at 48.) Her doctors at Baylor instructed her "to wear [a] brace" on her right hand, "all day, every day, and . . . to sleep in it." (R. at 43.) Plaintiff had difficulties holding things with her right hand. (R. at 43, 44.) She could hold a pen or pencil only in a certain way but was unable to "hold onto a pen well enough to write

out a letter." (R. at 44.) She was unable to manipulate her fingers, type, or use a keyboard. (R. at 44-45.) She could "peck at" the keyboard, but she could not "sit and type." (R. at 45.) Her doctors instructed her to stop using a computer mouse. (R. at 46.) Plaintiff testified that she could not perform a job that required her to type two hours out of an eight-hour work day, or even thirty minutes during an eight-hour workday. (R. at 47.)

Plaintiff had arthritis in her neck, which flared up "once every other day or once a week," and she had to lay flat on her bed to alleviate the pain. (R. at 49-50.) She experienced a sharp, stabbing pain in the middle of her neck that would go down to her shoulder, arm, and back. (R. at 50-51.) She was unable to turn her head all the way to her right and left. (R. at 51.) She also had asthma and used a nebulizer and an inhaler. (R. at 57.) Plaintiff had a history of smoking, but had stopped smoking in June 2014. (R. at 58.)

Plaintiff drove to her doctor's appointments and to the grocery store. (R. at 51.) She could not drive long distances because her legs and feet would get irritated and go numb if she did not move around within thirty minutes of sitting. (R. at 52.) The pain and numbness would also interfere with her ability to stand. (*Id.*) She claimed that she could only stand for 3-10 minutes and could not walk for long periods or distances without limping. (R. at 53.)

Plaintiff lived alone and occupied her time by massaging herself, walking around the house, and laying across the bed while using a heating pad. (R. at 54.) She could do some laundry, but it took her a long time. (*Id.*) She was unable to sweep and vacuum. (R. at 54-55.) Plaintiff belonged to a church, but she did not regularly attend because she was unable to sit for a long time. (R. at 55.)

### b.    VE's Testimony

The VE testified that she had reviewed Plaintiff's work history and vocational information

9

and determined that she had the following past relevant work: mortgage processor (DOT 249.362-022, sedentary, SVP: 5); mortgage clerk (DOT 249.362-014, sedentary, SVP: 5); claims clerk (DOT 209.362-034, sedentary, SVP: 6); receptionist (DOT 237.367-038, sedentary, SVP: 4); and secretary (DOT 201.362-030, sedentary, SVP: 6). (R. at 59.)

The ALJ asked the VE whether Plaintiff's past relevant work could be performed by a hypothetical person of the same age, education, and work experience, who was capable of light exertion, never climb ladders, ropes, scaffolds, or crawl, could perform other postural movements frequently, use right upper extremities frequently for handling and fingering, no limits on reaching, and would require work that involved only occasional exposure to dust and pulmonary irritants. (R. at 60-61.) The VE said that all of Plaintiff's past work could be performed except for the mortgage loan processor, because that job required fingering to be constant instead of frequent. (R. at 61.)

The ALJ added an additional limitation in that the hypothetical employee was limited to perform detailed, but not complex tasks. (*Id.*) The VE opined that the receptionist job would be the only job that would fall under the additional limitation. (*Id.*) The ALJ then asked if the hypothetical employee could still perform the receptionist job if the exertional demands were reduced to sedentary. (R. at 62.) The VE opined that the employee could still perform the receptionist job. (*Id.*)

The ALJ then changed the hypothetical to frequent handling and occasional fingering, with no limits on reaching. (*Id.*) The VE opined that the employee could still work as a receptionist and that other work could be performed, including an assignment clerk (DOT 219.387-010) with 68 jobs in Texas and 672 in the national economy; control clerk (DOT 209.362-014) with 143 jobs in Texas and 1,490 in the national economy; dispatcher (DOT 239.367-014) with 736 jobs in Texas and 7,943 in the national economy; and receptionist (DOT 237.367-038) with 6,114 jobs in Texas and 100,573

in the national economy. (R. at 63-64.)

The ALJ asked the VE if she could identify work for a hypothetical worker that could not perform sedentary exertional work, could not sit for six hours of the day or stand and walk for two hours of the day, and unable to lift with her upper extremities. (R. at 64.) The VE opined that there would not be any work available for such an employee. (R. at 65.) The ALJ then asked the VE if the hypothetical worker would be able to compete in the national economy if he or she were incapable of working an eight-hour day or a forty-hour week. (*Id.*) The VE responded that the hypothetical worker could not. (*Id.*) The ALJ asked the VE to assume that the hypothetical worker had to be off-task for more than 10% of the time or absent from work two or more days per month. (*Id.*) The VE opined that those additional limitations would preclude competitive work. (*Id.*)

The ALJ asked the VE whether a person "who needed to stand a few minutes every hour to stretch and rest" would be able to work as a receptionist. (*Id.*) The VE responded that it "would be acceptable" for a receptionist to "stand up and stretch" for a few minutes every hour. (R. at 66.)

Plaintiff's attorney referred the VE to the first hypothetical and asked whether the hypothetical employee could perform Plaintiff's past relevant work if he or she were limited to occasional handling and fingering. (*Id.*) The VE opined that the hypothetical worker would be unable to perform any past work under the new limitations. (R. at 67.) The attorney reduced the exertional strengths to sedentary and asked whether the hypothetical worker could perform Plaintiff's past relevant work. (R. at 68.) The VE opined that the worker could not perform any of the past work and would not have any transferable skills. (*Id.*)

C.      **ALJ's Findings**

The ALJ issued his decision denying benefits on February 12, 2015. (R. at 25.) At step one,

he found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 15, 2012. (R. at 15.) At step two, he found that Plaintiff had the following severe impairments: degenerative disc disease, carpal tunnel syndrome, diabetes mellitus with neuropathy, mild arthritis of the left knee, mild degenerative joint disease of the right hand, and asthma. (R. at 16.) Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (R. at 19.)

The ALJ next determined that Plaintiff had the RFC to perform sedentary work; lift and/or carry ten pounds occasionally and less than ten pounds frequently; stand and/or walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday with normal work breaks; occasionally climb ramps, stairs, balance, stoop, bend, squat, kneel, and crouch; never crawl or climb ladders, ropes, and scaffolds; able to use her right upper extremity frequently but not constantly for handling and fingering with no limits on reaching; and required a work environment involving no more than occasional exposure to dust and pulmonary irritants. (R. at 20.)

At step four, the ALJ found that Plaintiff was capable of performing her past relevant work as a mortgage clerk, claims clerk, receptionist, and secretary. (R. at 23.) At step five, he found that she was capable of performing other jobs including assignment clerk, control clerk, and dispatcher. (R. at 24.) The ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from October 15, 2012, through the date of his decision. (R. at 24.)

## II.  LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *Id.* A court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.* at 436 & n.1.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only

13

prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of

the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810

F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back

to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457,

461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-

step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir.

1987).

## III. ISSUES FOR REVIEW

Plaintiff raises two issues for review:

[1] The ALJ improperly rejected the Plaintiff's treating physician's opinions without
conducting a proper analysis.

[2] The ALJ's found residual functional capacity was based solely upon his
erroneous interpretation of the medical records.

(doc. 18 at 4.)

## A.     Treating Source Opinion

Plaintiff argues that the ALJ improperly rejected Dr. Eddy's treating source opinion without

conducting an analysis under 20 C.F.R. § 404.1527. (*Id*. at 9-13.)

The Commissioner is entrusted with weighing medical opinion evidence when determining

disability status. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its

source, but the Commissioner generally gives greater weight to opinions from a treating source. *Id.*

at § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable

medical source" who provides or has provided a claimant with medical treatment or evaluation, and

who has or has had an ongoing treatment relationship with the claimant. *Id.* at § 404.1502. When

"a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s)

is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id*. at § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* at § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id*. A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 455–56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id*. at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the

medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

In his decision, the ALJ identified Dr. Eddy as Plaintiff's "treating physician," cited to his treatment notes, and evaluated the medical opinions that he made in an RFC questionnaire dated July 29, 2013. (R. at 21-23.) The ALJ noted Dr. Eddy's opinion that Plaintiff was "only capable of working a less than sedentary RFC and would miss [work] more than 4 times per month" because she could stand and walk for less than 2 hours out of an 8 hour workday and had significant limitations with fingering and reaching. (R. at 22.) He also noted its inconsistency with Dr. Eddy's own treatment notes and records, which stated that Plaintiff's knee arthritis was "only mild," her physical examinations were routinely "normal," her carpal tunnel was treated with over-the-counter pain medication and a splint, and she had "noted improved pain in her arms and legs" in March 2014. (R. at 22-23.) The ALJ ultimately gave Dr. Eddy's RFC questionnaire "some weight" because it was consistent with his "assessment that [Plaintiff was] capable of performing sedentary work," but the opinions on the severity of Plaintiff's limitations, particularly the significant manipulative limitations, were "unsupported by explanation or by the balance of the medical evidence of record." (R. at 23.)

Though he did not give controlling weight to Dr. Eddy's opinions in the RFC questionnaire, the ALJ conducted an analysis under the § 404.1527 factors to determine the proper amount of weight to assign to these medical opinions. He first identified the proper standard for evaluating medical opinions and stated how he "considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527." (R. at 20.) He then specifically stated that Dr. Eddy was Plaintiff's "treating physician," identified his medical records and examination notes since February

2013, referenced multiple pieces of medical evidence identifying him as an internal medicine specialist, and recognized that he treated the Plaintiff for diabetes and pain management. (R. at 22-23.) The ALJ further addressed the factors of supportability and consistency by noting how portions of Dr. Eddy's opinion in his RFC questionnaire were inconsistent with his own treatment notes and were unsupported by the "balance of the medical evidence of record." (R. at 23.) The ALJ provided sufficiently specific reasons for not giving controlling weight to Dr. Eddy's treating source opinions.

The ALJ properly considered the medical opinions and RFC questionnaire of Dr. Eddy and went through the factors necessary in analyzing them, and substantial evidence supports the ALJ's decision. *See Newton*, 209 F.3d at 458; *see also Zapata v. Colvin*, No. 4:13-CV-340-Y, 2014 WL 4354243, at *9 (N.D. Tex. Sept. 2, 2014). To the extent that Plaintiff complains of the failure to weigh Dr. Eddy's medical opinions or fully include them in Plaintiff's RFC, the ALJ did not err, and remand is not required on this issue.

**B.      RFC Assessment**

Plaintiff also argues that her RFC assessment was based upon the ALJ's erroneous interpretation of her medical records. (doc. 18 at 13-16.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ's determination necessarily includes an assessment of the nature and extent of a claimant's limitations and determines what the claimant can do "on a regular and continuing basis." *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) ("Both [20 C.F.R. § 404.1545 (2002) and SSR 96–8p (1996)] make clear that RFC is a measure of the claimant's capacity to perform work 'on a regular and continuing basis.'"). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision, or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if it would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). A reviewing court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the ALJ's decision." *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Johnson*, 864 F.2d

at 343 (citations omitted).

In his decision, the ALJ first identified Plaintiff's severe impairments as degenerative disc disease, carpal tunnel syndrome, diabetes mellitus with neuropathy, mild arthritis in her left knee, mild degenerative joint disease in her right hand, and asthma. (R. at 16.) He then assessed the treating and consultative medical evidence in the record to determine the extent of the limitations caused by her severe impairments. (R. at 21-24.) The ALJ noted and directly considered her Baylor treatment and emergency room records; the consultative physical examination by Dr. Panjwani; Dr. Eddy's RFC questionnaire; the RFC assessments from the SAMCs; the consultative mental examination by Dr. Cooper; and Plaintiff's testimony from the administrative hearing. (R. at 17, 21-23.) He assigned "some weight" to Dr. Eddy's RFC questionnaire because it was consistent with the assessment in other medical records that Plaintiff was "capable of performing sedentary work," but the opinions on the extent of Plaintiff's other limitations, particularly her manipulative limitations, were "unsupported by explanation or by the balance of the medical evidence." (R. at 23.) The ALJ further determined that the SAMCs' RFC assessments on how Plaintiff was able to perform light work were "unsupported by the record" because their opinions did "not adequately consider the repeated reports of pain that [Plaintiff had] consistently made to her treating physician." (R. at 22-24.) The ALJ ultimately determined that Plaintiff had the RFC to perform sedentary work; lift and/or carry ten pounds occasionally and less than ten pounds frequently; stand and/or walk for two hours in an eight-hour workday; sit six hours in an eight-hour workday with normal work breaks; occasionally climb ramps, stairs, balance, stoop, bend, squat, kneel, and crouch; never crawl or climb ladders, ropes, and scaffolds; able to use her right upper extremity frequently but not constantly for handling and fingering; and restricted to a work environment with no more than

occasional exposure to dust and pulmonary irritants. (R. at 20.)

Here, Plaintiff argues that the ALJ was "playing doctor" and "made up his own RFC" because he "rejected every medical opinion before him that assessed the Plaintiff's ability to perform functional limitations [and] interpreted medical records in the file without medical guidance."[4] (doc. 18 at 15-16.) The decision, however, shows that the ALJ based his RFC assessment on Plaintiff's medical record and Dr. Eddy's RFC questionnaire, to the extent his opinions were consistent with the other evidence in the record. (R. at 20-23.) He agreed with Dr. Eddy's opinion that Plaintiff was limited to sedentary work, as opposed to the SAMCs' opinions that she was limited to light work, because it was supported by his assessment of her medical records. (R. at 23.) The ALJ, however, did not fully adopt Dr. Eddy's opinions in the RFC questionnaire, particularly his opinion on Plaintiff's significant manipulative limitations, because these limitations were not supported by her treatment records or progress notes. (R. at 23.) The ALJ instead specifically identified several medical records where Plaintiff exhibited a normal gait, had "5/5" strength in all extremities, showed that "her knee arthritis [was] only mild," and that she continued to maintain a "significant amount of daily activities," such as driving, shopping, and household chores, even after her alleged date of disability. (R. at 22-23.)

Based upon the medical records and evidence, the ALJ determined Plaintiff's RFC and her ability to sustain work-related activity on a regular and continuing basis. (R. at 20.) The decision does not show that the ALJ "played doctor" by failing to afford controlling weight to any single medical opinion; it instead shows that he fulfilled his role as the finder of fact to weigh the evidence

---

[4] The phrase "playing doctor" was used in *Frank v. Barnhart*, 326 F.3d 618, 621-22 (5th Cir. 2003), which held that the ALJ erred when he drew his own medical conclusions that were contrary to the claimant's subjective statements and the weight of "vast" medical evidence.

in the record, resolve all conflicts in the evidence, and make an administrative assessment of Plaintiff's ability to work. *See Coats v. Colvin*, No. 3:12-CV-4968-M, 2013 WL 6052879, at *5 (N.D. Tex. Nov. 14, 2013) (noting that an ALJ "is not playing doctor by determining which of contradictory medical opinions to credit [because] that is precisely the type of conflict he is called upon to resolve") (citing *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005)). The record, moreover, provides substantial evidence to support the ALJ's finding as to Plaintiff's RFC.

The ALJ did not err when assessing Plaintiff's RFC because he was entitled to weigh the evidence against other objective findings, including the opinion evidence available and the record as a whole. A reviewing court must therefore defer to the ALJ's decisions. *See Leggett*, 67 F.3d at 564. Remand is not required on this issue.

## IV. CONCLUSION

Plaintiff's summary judgment motion (doc. 18) is **DENIED**, Defendant's cross-motion for summary judgment (doc. 21) is **GRANTED**, and the Commissioner's decision is **AFFIRMED**.

**SO ORDERED** this 24th day of October, 2017.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE